**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BIGFOOT VENTURES LIMITED,

*Plaintiff - Appellant*,

v.

MARK S. KNIGHTON;
SHAPETOOLS, LLC;
NEXTENGINE, INC., Nominal
Defendant,

*Defendant - Appellees*.

No. 23-2940

D.C. No.
2:19-cv-08164-
CJC-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, Senior District Judge, Presiding

Argued and Submitted December 6, 2024
Pasadena, California

Filed March 28, 2025

Before: Ronald M. Gould, Richard R. Clifton, and Gabriel
P. Sanchez, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Shareholder Derivative Action

The panel affirmed the district court's dismissal of Bigfoot Ventures Limited's shareholder derivative action on behalf of NextEngine, Inc. against Mark S. Knighton, ShapeTools, LLC, and NextEngine.

The panel used the multi-factor test in *Larson v. Dumke*, 900 F.2d 1363 (9th Cir. 1990), to assess the adequacy of representation by a plaintiff in a shareholder derivative action. The panel clarified that it was not mandatory for a court to assess each and every one of the eight *Larson* factors when determining plaintiff adequacy. In addition, the *Larson* factor test is not exhaustive, and courts may consider other factors like outside entanglements in addition to the *Larson* factors.

Applying Fed. R. Civ. P. 23.1 and the *Larson* factor test, the panel held that the district court did not err in considering the ongoing litigation between Bigfoot and NextEngine under "outside entanglements." The record supported the district court's finding that this derivative action appears to be leverage in Bigfoot's other lawsuits against NextEngine, and that conclusion weighed heavily against plaintiff's adequacy to advance the corporation's interests on behalf of shareholders in a derivative action.

The panel also held that the factors expressly listed in *Larson* supported the district court's finding of plaintiff

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

inadequacy. First, there were indications that Bigfoot was the true party in interest but as a separate entity and not as a NextEngine shareholder. Second, Bigfoot's personal interest in seeking to gain control of NextEngine's intellectual property was greater than its interest in asserting rights on behalf of NextEngine in this shareholder derivative action. Third, nothing indicated that NextEngine shareholders support this derivative action. Fourth, the lengthy history of litigation supported the district court's finding that Bigfoot was vindictive toward NextEngine and Knighton. Accordingly, the panel affirmed the district court's dismissal of Bigfoot's suit because Bigfoot was an inadequate plaintiff for this shareholder derivative action.

Because the district court acted within its discretion by vacating trial in order to carefully consider the parties' views on the important threshold inquiry of plaintiff adequacy, the panel held that the district court did not abuse its discretion by vacating trial to hear the motion to dismiss.

## COUNSEL

Adam T. Hoover (argued), Reich Radcliffe and Hoover LLP, Newport Beach, California, for Plaintiff-Appellant.

Shea S. Murphy (argued), Esner Chang Boyer & Murphy, Pasadena, California; Andrew J. Spielberger, Balaban & Spielberger LLP, Los Angeles, California; for Defendants-Appellees.

# OPINION

GOULD, Circuit Judge:

Plaintiff-Appellant Bigfoot Ventures Ltd. ("Bigfoot") brought a shareholder derivative action on behalf of NextEngine, Inc. ("NextEngine") against Mark S. Knighton, ShapeTools, LLC ("ShapeTools"), and NextEngine (collectively "Defendant-Appellees"). Defendant-Appellees moved to dismiss Bigfoot's suit, contending that Bigfoot cannot fairly or adequately represent the interest of NextEngine's shareholders, which is required by Federal Rule of Civil Procedure 23.1 ("FRCP 23.1"). The district court granted Defendant-Appellees' motion and dismissed Bigfoot's suit. We hold that the district court did not abuse its discretion or otherwise act contrary to law in granting the motion to dismiss or in vacating the trial date to hear the motion. We affirm and take this opportunity to clarify the application of the *Larson* factor test.

## I.    BACKGROUND

Knighton founded NextEngine, a company "involved in research, development, manufacturing, and sale of three dimensional laser scanners." *NextEngine Inc. v. NextEngine, Inc.*, 2021 WL 4026759, at *1 (C.D. Cal. Sept. 3, 2021). He is also the Chairman, Chief Executive Officer, and largest shareholder of NextEngine. NextEngine has patent protection in a portfolio of about twenty patents ("IP").

Michael Gleissner was one of the first principal investors in NextEngine, acquiring stock and giving NextEngine capital through his venture capital firm, Bigfoot. Between 2002 and 2005, Bigfoot made several loans to NextEngine

through secured promissory notes. [1]   These notes were secured by NextEngine's IP.

When the operative secured promissory note became due in 2008, NextEngine was not able to pay.  NextEngine and Bigfoot agreed to restructure that loan pursuant to a Secured Promissory Note ("2008 Note") and five Agreements [2] (collectively, the "2008 Agreements").  The restructuring did not alter Bigfoot's first place security interest in NextEngine's IP.  *Id.* at *2.  As part of the Assignment and License Agreement, NextEngine had an exclusive license to freely use the IP "subject to certain revocation rights, including if [NextEngine] defaulted under the [2008] Note." *Id*.

The 2008 Agreements "required that the collateral be assigned to and held by a third party custodian or escrow entity." *Id.*  NextEngine and Bigfoot created NextPat Ltd. ("NextPat") for the purpose of holding the collateral IP.  *Id.* at *2, 4.  When NextPat was formed, Bigfoot owned 51 of NextPat's shares and NextEngine owned 49 of NextPat's shares. *Id.* at *1.

In April 2008, Bigfoot sued NextEngine in state court to collect on the 2008 Note.  Since then, there have been several lawsuits between Defendant-Appellees, on the one hand, and Bigfoot and its affiliates, on the other hand.  These lawsuits are described in the district court's decision.  *See Bigfoot Ventures Ltd. v. Knighton*, 2023 WL 9318505, at *3–5 (C.D.

---

[1] The first secured promissory note was memorialized in 2005 but was replaced by another secured promissory note in 2007.

[2] An Assignment and License Agreement, a Share Mortgage Agreement, a Shareholders Agreement, a Mutual Release Agreement, and a Pledge Agreement. *NextEngine*, 2021 WL 4026759, at *1.

Cal. Sept. 14, 2023). We summarize the litigation history below.

## A.  Prior judgments

In 2012, a jury found for NextEngine and confirmed that the 2008 Note's collateral was NextEngine's IP. *See Bigfoot Ventures, Ltd. v. NextEngine, Inc.*, 2013 WL 6497960, at *2, 7 (Cal. Ct. App. Dec. 11, 2013). The jury awarded NextEngine $4,506,000 in total damages against Bigfoot based on NextEngine's cross-claims against Bigfoot for lender misconduct (specifically, Bigfoot's treatment of the IP pledged as collateral) and $724,951.22 in attorney's fees. *See id.* at *7, 11; *Bigfoot Ventures, Ltd. v. NextEngine, Inc.*, 2019 WL 5780002, at *2 (Cal. Ct. App. Nov. 6, 2019). Instead of seeking to collect on this judgment, NextEngine assigned the award to Bigfoot.

In 2017, a state court awarded Bigfoot about $8 million in another lawsuit because of NextEngine's default on the 2008 Note. *See id.* at *4. The state court later found that Knighton was the alter ego of NextEngine and amended the judgment to add him individually as a judgment debtor. *See NextEngine*, 2021 WL 4026759, at *7. Upon this judgment, Bigfoot became the sole owner of NextPat's 100 shares and was able through NextPat to sell the IP in a commercially reasonable manner in order to satisfy the judgment. *See id.* at *5. Bigfoot did not try to obtain fair market value for the IP, however.

## B.  NextPat's lawsuit against NextEngine

Instead, NextPat sued NextEngine in state court in February 2010 for breach of the Assignment and License Agreement. NextPat was represented by the same counsel who represented Bigfoot. In January 2017, NextPat gave

NextEngine written notice that it was terminating NextEngine's exclusive license to freely use the IP because of NextEngine's default on the 2008 Note. NextPat demanded that NextEngine cease using the IP, which would result in shutting down NextEngine's operations, but NextEngine did not stop using the IP. In May 2017, NextPat sued NextEngine again seeking declaratory judgment that the License Agreement was terminated and seeking injunctions against NextEngine to prevent use of the IP.

## C. NY NextEngine's lawsuit against NextEngine

In March 2017, Gleissner incorporated a company called NextEngine Inc. in New York ("NY NextEngine"). In December 2017, NextPat and NY NextEngine entered into agreements that assigned all right, title, and interest in NextPat's trademarks to NY NextEngine for $10 and all right, title, and interest in and to NextPat's registered patents to NY NextEngine for $10. In these agreements, Gleissner signed both as NextPat's President and as NY NextEngine's President.

After these agreements were finalized, NY NextEngine sued NextEngine and Knighton in federal court for trademark and patent infringement, contending that NY NextEngine had become the beneficial owner of all rights, title, and interest in and to the IP.[3] *NextEngine*, 2021 WL 4026759, at *6. In September 2021, the district court determined that the 2008 Agreements "did not grant any rights beyond that of a secured creditor, at best," to NextPat

---

[3] In February 2020, while that lawsuit was pending, NY NextEngine assigned all its purported rights, title, and interest in and to all the patents back to NextPat for $10. *NextEngine*, 2021 WL 4026759, at *6. Gleissner again signed the agreements himself as President of both NextPat and NY NextEngine. *Id.* at *7.

and dismissed NY NextEngine's claims. *Id.* at \*11. From this, it appears that NextEngine remained the owner of the IP and NextPat had only a security interest in the IP collateral. *See id.* at \*10–11 (finding "no support for the inference that NextPat's security interest equates to full ownership of the [IP]").

## D. ShapeTools and Present Litigation

In October 2017, Bigfoot learned that Knighton had incorporated ShapeTools and executed an agreement between NextEngine and ShapeTools, which transferred all of NextEngine's inventory and revenue to ShapeTools.[4] In July 2020, the state court found that ShapeTools existed only to shield NextEngine from its debt to Bigfoot and amended the 2017 judgment to add ShapeTools as a judgment debtor. *See id.* at \*7.

In September 2019, Bigfoot brought this shareholder derivative action on behalf of NextEngine against Defendant-Appellees, contending that the agreement with ShapeTools was not intended to benefit NextEngine or its shareholders. In April 2023, a month before trial was set to begin, Bigfoot sued Knighton in still another lawsuit alleging voidable transfer.[5]

The district court held a status conference on July 31, 2023 to select a new trial date. At this conference, Defendant-Appellees indicated that they planned to file a motion to dismiss based on subject matter jurisdiction. The

---

[4] Defendant-Appellees contend that Knighton was advised to incorporate ShapeTools because it was "a suitable structure that could preserve and maintain the IP, and sustain operation until resolution of litigation."

[5] Bigfoot contended that after Knighton was added to the 2017 judgment, Knighton fraudulently encumbered his Santa Monica residence.

parties agreed to an expedited briefing schedule to hear the motion before trial, and the district court set a hearing for the motion on August 14, 2023 and set the trial for August 22, 2023.

On August 7, 2023, Defendant-Appellees filed a motion to dismiss (the "Motion") arguing that Bigfoot cannot fairly or adequately represent the interest of NextEngine's shareholders. Bigfoot filed its opposition to the Motion three days later and contended that the Motion raises "a sprawling yet incomplete landscape of extrajudicial facts." Bigfoot then stated "that the [c]ourt has two options: it can deny the Motion, or it can vacate the trial and set a briefing schedule pursuant to Rule 56." *See* Fed. R. Civ. P. 56 (on summary judgment). Following Bigfoot's second recommendation, the district court vacated the trial date because Defendant-Appellees "raised significant issues," which "must be resolved before any bench trial in this case." The district court ordered the parties to provide supplemental briefing on whether Bigfoot satisfied "the eight *Larson* factors." The multi-factor test in *Larson v. Dumke* is used to assess the adequacy of representation by a plaintiff in a shareholder derivative action. 900 F.2d 1363, 1367 (9th Cir. 1990).

In support of Defendant-Appellees' supplemental brief, several shareholders submitted declarations that "formally and emphatically object to Bigfoot's derivative action." These shareholders did not believe that Bigfoot could competently and fairly represent their interests as NextEngine shareholders because of "Bigfoot's chronic litigation" against NextEngine. These shareholders believed that "Bigfoot's misconduct here damages [their] property rights." On September 14, 2023, the district court granted the Motion and dismissed Bigfoot's suit.

## II.    STANDARD OF REVIEW

We review for abuse of discretion the district court's determination of plaintiff's inadequacy under FRCP 23.1. *Larson*, 900 F.2d at 1364. Abuse of discretion occurs when we have a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors" or if the district court "does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1464 (9th Cir. 1995) (cleaned up).

The general rule is that "[t]he timing of trials and control of the docket are matters left to the discretion of the district court." *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1340 (9th Cir. 1985). The district court's decisions in "supervising the pretrial phase of litigation . . . will not be disturbed unless they evidence a clear abuse of discretion." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992) (cleaned up). Because the district court is in a better position than an appellate court to reach conclusions about how a district court should manage its own docket, exceptions to the general rule above stated should be few and far between.

## III.    DISCUSSION

### A.  Clarifying the *Larson* factor test

Shareholder derivative actions are considered "a remedy of last resort," *Kayes*, 51 F.3d at 1463 (cleaned up), and FRCP 23.1(a) states that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or

members who are similarly situated in enforcing the right of the corporation or association."

*Larson v. Dumke* explained that "an adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class."  900 F.2d at 1367.  "[E]stablish[ing] criteria for determining adequacy of representation" in shareholder derivative actions, *Larson* set out eight factors to consider:

> (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from other shareholders; (5) the lack of any personal commitment to the action on the part of the representative plaintiff; (6) the remedy sought by plaintiff in the derivative action; (7) the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; and (8) plaintiff's vindictiveness toward the defendants.

*Id*. (cleaned up).   "These factors are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of [FRCP] 23.1."  *Id.* (cleaned up).

We clarify that it is not mandatory for a court to assess each and every one of the *Larson* factors when determining

plaintiff adequacy in a shareholder derivative action.   In *Larson*, we gathered past cases addressing plaintiff adequacy in a shareholder derivative action to create the *Larson* eight-factor test.  *See id.*  But what matters most in determining plaintiff adequacy in a shareholder derivative action is the text of FRCP 23.1.   Although the *Larson* factors are important, they are only intended to guide courts in assessing plaintiff adequacy under FRCP 23.1.  The *Larson* factor test is not rigid but rather flexible, giving courts discretion to choose the controlling factors upon which to focus and how much weight each of those factors should be given in deciding particular cases.

The *Larson* factor test is not exhaustive.  Courts may consider other factors like outside entanglements in addition to the *Larson* factors, and district courts in our circuit already have done so.  *See, e.g.*, *RePET, Inc. v. Zhao*, 2016 WL 11518482, at *5 (C.D. Cal. June 28, 2016); *Kenneth v. Yeung Chi Shing Holding (Del.), Inc.*, 2020 WL 409010, at *8 (N.D. Cal. Jan. 24, 2020).   Courts can consider whatever other factors help them to assess whether a plaintiff "does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."  *See* Fed. R. Civ. P. 23.1.  Courts may consider those factors in addition to the *Larson* factors.

## B.  Applying FRCP 23.1 and the *Larson* factor test

The district court did not err in considering the ongoing litigation between Bigfoot and NextEngine under "outside entanglements."  Such entanglements may "mak[e] it likely that the interests of the other stockholders will be disregarded in the management of the suit."  *RePET*, 2016 WL 11518482, at *5.  In *Hornreich v. Plant Industries, Inc.*,

we affirmed the district court's finding that the plaintiff was inadequate to represent corporate shareholders in the derivative action in part because the plaintiff had previously engaged in several pending lawsuits against the defendant and threatened litigation as leverage for the resolution of the plaintiff's other claims. 535 F.2d 550, 551–52 (9th Cir. 1976).

Similarly, there have been frequently litigated disputes between NextEngine and Bigfoot or its affiliates, NextPat and NY NextEngine, since 2008 concerning Gleissner's investments in NextEngine and NextEngine's ownership of the IP. *See supra* Section I.A–C. NextEngine prevailed in a lawsuit because of Bigfoot's treatment of the IP pledged as collateral to the 2008 Note. *See Bigfoot*, 2013 WL 6497960, at *7. But Bigfoot prevailed in another lawsuit to collect on the 2008 Note, on which NextEngine defaulted. *Bigfoot*, 2019 WL 5780002, at *4. Because of NextEngine's default, Bigfoot became entitled to sell the IP in a commercially reasonable manner to satisfy the judgment. *See NextEngine*, 2021 WL 4026759, at *5.

But instead of trying to obtain fair market value for the IP to retire the 2008 Note, Bigfoot initiated several lawsuits against NextEngine to gain ownership of the IP. NextEngine and Bigfoot created NextPat solely for the purpose of holding the IP collateral, but both NY NextEngine and NextPat were represented by the same counsel as Bigfoot. NextPat has sued NextEngine twice seeking to enjoin NextEngine from using the IP. NY NextEngine also sued NextEngine for trademark and patent infringement, contending that NY NextEngine had become the beneficial owner of all rights, title, and interest in and to the IP, after Gleissner signed agreements on behalf of NextPat and NY

NextEngine that assigned all right, title, and interest in the registered patents from NextPat to NY NextEngine.

Because of its consistently contentious nature, Bigfoot and its affiliates' lawsuits against NextEngine are significant outside entanglements, making it probable that the "interests of [NextEngine's] stockholders will be disregarded in the management of th[is] suit." *See RePET*, 2016 WL 11518482, at \*5 (cleaned up). The record supports the district court's finding that this derivative action "appears to be . . . leverage in [Bigfoot's] other lawsuits" against NextEngine. That conclusion weighs heavily against plaintiff's adequacy to advance the corporation's interests on behalf of shareholders in a derivative action. *See Hornreich*, 535 F.2d 550 at 551–52. Several NextEngine shareholders have submitted declarations objecting to this derivative action in part because of "Bigfoot's chronic litigation" against NextEngine. These shareholders do not believe that Bigfoot can competently and fairly represent their interests. We credit those shareholders' views because of the strong evidence that Bigfoot is more likely to be motivated by its personal interests than to be acting as a fair steward for the interests of all corporate shareholders. We hold that this derivative action cannot be maintained because Bigfoot "does not fairly and adequately represent the interests of [NextEngine's] shareholders." *See* Fed. R. Civ. P. 23.1; *see also Larson*, 900 F.2d at 1367 ("An adequate representative must . . . be free from economic interests that are antagonistic to the interests of the class.").

The factors expressly listed in *Larson* also support the district court's finding of plaintiff inadequacy. The district court correctly found four *Larson* factors weighed against plaintiff adequacy for Bigfoot. We review the district

court's factual findings for clear error. *See Kayes*, 51 F.3d at 1464.

First, there were indications that Bigfoot was the true party in interest but as a separate entity and not as a NextEngine shareholder. *See Larson*, 900 F.2d at 1367. Shareholders of a corporation "enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1. But Bigfoot was not attempting to enforce a right on behalf of NextEngine. Instead, the district court found that this derivative action was another attempt by Bigfoot to collect on its judgment and take ownership of NextEngine's IP, so the true party in interest was Bigfoot trying to advance its own separate interests as an entity antagonistic to NextEngine rather than Bigfoot as a NextEngine shareholder. *See, e.g.*, *NextEngine*, 2021 WL 4026759, at *10–11 (dismissing NY NextEngine's claims because NY NextEngine was not, as it contended, owner of the IP).

Second, Bigfoot's personal interest in seeking to gain control of NextEngine's IP was greater than its interest in asserting rights on behalf of NextEngine in this shareholder derivative action. *See Larson*, 900 F.2d at 1367. The district court found that Bigfoot's primary goals were to collect its judgment and own the IP, not to assert NextEngine's rights as a corporation.

Third, nothing indicated that NextEngine shareholders support this derivative action. *See id*. No shareholders submitted declarations supporting or endorsing the derivative action as being in their interest. To the contrary, three shareholders submitted declarations that "formally and emphatically object to Bigfoot's derivative action." These shareholders did not believe Bigfoot could competently and

fairly represent their interests as NextEngine shareholders, and instead believed Bigfoot's misconduct here damaged their property rights.

And fourth, the lengthy history of litigation supported the district court's finding that Bigfoot was vindictive toward NextEngine and Knighton. *See id*. A plaintiff's "personal vindictiveness or animosity" towards defendants weighs against finding that a plaintiff could adequately represent the interests of corporate shareholders in a shareholder derivative action. *See id.* at 1369. "The reason we consider vindictiveness . . . is to render ineligible individuals who possess animus that would preclude the possibility of a suitable settlement." *Kayes*, 51 F.3d at 1464. "In certain circumstances, the filing of multiple lawsuits can demonstrate vindictiveness and lead to disqualification of an individual as a representative under [FRCP] 23.1." *Kenneth*, 2020 WL 409010, at *9 (citing *Hornreich*, 535 F.2d at 551–52).

In *Kayes*, we held that the district court may have abused its discretion in finding that the vindictiveness factor weighed against plaintiff adequacy because the district court gave "undue weight to litigation which was neither pending, nor tending to show unusual animus towards [d]efendants other than a desire to protect named plaintiffs' rights." 51 F.3d at 1464–65. The lawsuits at issue in *Kayes* "indicate[d] a desire to protect [shareholders'] shared financial interests." *Id.* at 1464.

Here, Bigfoot and its affiliates have repeatedly sued Defendant-Appellees since 2008. Although Bigfoot's initial lawsuits aimed to protect its right to collect on the 2008 Note, *see Bigfoot*, 2019 WL 5780002, at *4, Bigfoot's subsequent lawsuits sought to take ownership of the IP from

NextEngine. And Bigfoot's more recent lawsuit, filed a month before trial was set to begin in this derivative action, was against Knighton for voidable transfer. Unlike the lawsuits in *Kayes*, these lawsuits do not "indicate a desire to protect [shareholders'] shared financial interests." *See* 51 F.3d at 1464. Instead, these lawsuits show "unusual animus" from Bigfoot toward Defendant-Appellees, and the record supports the district court's factual finding that Bigfoot was sufficiently vindictive towards Defendant-Appellees. *Cf. id.*

The record also supports the district court's finding that Bigfoot "possess[es] animus that would preclude the possibility of a suitable settlement," which is precisely why we consider vindictiveness when evaluating adequacy of representation. *See id.* Bigfoot and its affiliates continued initiating lawsuits against NextEngine despite NextEngine choosing not to collect the 2012 judgment and assigning the award back to Bigfoot in an attempt of conciliation.[6]

Because the district court correctly analyzed the requirements of Rule 23.1(a) and the record supports its findings, the district court did not abuse its discretion in finding that Bigfoot was an inadequate plaintiff for this derivative action. As clarified above, the *Larson* factor test

---

[6] The district court erred in its analysis of two of the *Larson* factors—namely, "plaintiffs' unfamiliarity with the litigation and unwillingness to learn about the suit" and "the lack of any personal commitment to the action on the part of the representative plaintiff." *Larson*, 900 F.2d at 1367 (cleaned up). Finding that Bigfoot was too familiar and committed to the action, the district court improperly weighed these factors against it. But as discussed, not every *Larson* factor must be analyzed individually for a plaintiff to be found inadequate. Here, the district court's determination against Bigfoot is amply supported by Bigfoot's outside entanglements and inadequacy in light of the four other *Larson* factors analyzed in *supra* Section III.B.

is flexible and gives courts the discretion to choose which factors to focus on and how to weigh those factors in particular cases. *See supra* Section III.A. Here, the district court considered the four most salient factors in its analysis, and we perceive no abuse of discretion in the weight the district court applied to these factors. *See Kayes*, 51 F.3d at 1464.

Courts should also keep in mind that a derivative action is an extraordinary procedure that "impinge[s] on the inherent role of corporate management to conduct the affairs of the corporation." 5 MOORE'S FEDERAL PRACTICE – CIVIL § 23.1.02 (2025). To shift this responsibility to a corporate shareholder is extraordinary and should be viewed with caution. *See Kayes*, 51 F.3d at 1463 ("[T]he law has historically been particularly wary of allowing *shareholders* to sue on their *corporation's* behalf. Because of the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations, courts have generally characterized shareholder derivative suits as a remedy of last resort." (cleaned up) (emphasis in original)). Shareholder derivative actions can be a necessary corrective in cases where corporate control is being abused or misused. *See* 3 TREATISE ON THE LAW OF CORPORATIONS § 15:2 (2024) ("Shareholder derivative suits are the principal remedy by which defrauded minority shareholders may call [management] to account for mismanagement, diversion of assets, and fraudulent manipulation of corporate affairs."); *id.* at § 15:3 (collecting examples of derivative claims). But those reasons only highlight why testing a particular shareholder's adequacy to advance the interests of the corporation's shareholders is a critical prerequisite for a derivative action. *See* Fed. R. Civ. P. 23.1.

We affirm the district court's dismissal of Bigfoot's suit because Bigfoot was an inadequate plaintiff for this shareholder derivative action.

## C. Vacating trial to hear the Motion

We next address Bigfoot's challenge to the district court's decision to vacate trial and hear the Motion. Our prior holdings make it clear that district courts are "given broad discretion in supervising the pretrial phase of litigation," *Johnson*, 975 F.2d at 607 (cleaned up), and that "[t]he timing of trials and control of the docket are matters left to the discretion of the district court," *Coursen*, 764 F.2d at 1340. Because we review a district court's control of its docket for abuse of discretion, *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1086 (9th Cir. 2012), our inquiry is limited to whether the relevant district court decision applied an incorrect legal standard or was based on an illogical application of the facts. *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (*en banc*).

Here, the district court did not err in vacating trial to hear the Motion. Regardless of the precise label[7] under which Defendant-Appellees brought the Motion, the district court correctly determined that the Motion raised significant issues of plaintiff adequacy that "must be resolved before any bench trial in this case." Because of that determination, the district court followed one of Bigfoot's recommendations and vacated the August 22, 2023 trial date and ordered supplemental briefing on the *Larson* factors. Our analysis on plaintiff adequacy, *see supra* Section III.B.,

---

[7] Bigfoot contends that the Motion was not a challenge to subject matter jurisdiction, which can be brought at any time under FRCP 12(b)(1), but rather a defense brought under FRCP 12(c).

further vindicates the district court's concern. We will not interfere with the district court's broad discretion to supervise the timing of trials when we agree with the legal reasons underlying its decision. *See Coursen*, 764 F.2d at 1340.

The record also reflects that the district court proceeded in a reasonable manner by affording the parties sufficient time for supplemental briefing on the *Larson* factors. Although Bigfoot contends that it had "only *three days* to respond" to the Motion, the district court's decision to vacate trial gave Bigfoot until August 31 to file a supplemental brief—twenty-one days after the original deadline to oppose the Motion.

Because the district court acted within its discretion by vacating trial in order to carefully consider the parties' views on the important threshold inquiry of plaintiff adequacy, we hold that the district court did not abuse its discretion by vacating trial to hear the Motion.

**AFFIRMED.**